STATE OF CONNECTICUT   :   3:17mj1930(SALM)

: December   , 2017

COUNTY OF NEW HAVEN   :

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Amanda Devan, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am employed as a Detective with the Naugatuck Police Department, where I have worked since 2001. I am a Task Force Officer with the Human Trafficking Task Force of the Department of Homeland Security in New Haven, Connecticut. I have been involved in the investigation of child sexual exploitation, sexual assault for several years and have been a member of the Internet Crimes against Children Task Force (ICAC) since 2011. I have participated in criminal investigations involving the production, distribution, receipt, and possession of visual depictions and related materials involving minors engaged in sexually explicit conduct (child pornography), as defined in Title 18, United States Code, Section 2256. I have become familiar in the conduct of such investigations through on the job experience, and discussions with other Agents and officers who have been conducting child pornography investigations for several years. I have also attended training classes related to child pornography investigations put on by the Department of Homeland Security Investigations and other law enforcement organizations. Your affiant has observed numerous examples of child pornography in all forms of media, including computer media. I have also participated in the

execution of numerous search warrants and arrest warrant involving child sexual exploitation and child pornography offenses.

2. I am currently investigating an individual for the use of the Kik Interactive, Inc. account known as "silentfriend" for the distribution, possession, and/or access with intent to view child pornography, via the Internet, by a computer user at 13 Arthur Court, North Branford. For the reasons set forth below, I have probable cause to believe and I do believe that Daniel Fleischauer has engaged in the distribution of pornography using a computer or other mobile device, in violation of Title 18, United States Code, Section 2252A(a)(2).

3. This affidavit is being submitted in support of a criminal complaint and arrest warrant for Daniel Fleischauer, of 13 Arthur Court, North Branford, Connecticut, 06471 for distribution of child pornography, in violation of 18 U.S.C. §2252A(a)(2).

4. The statements in this affidavit are based in part on information provided by other members of local, state and federal law enforcement, my own investigation to include personal observations, documents and other investigative materials which I have reviewed, as well as my training and experience as a Police Detective and Task Force Officer with the human Trafficking Task Force of HSI.

5. Since this affidavit is being submitted for the limited purpose of securing a criminal complaint and arrest warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause that Daniel Fleischauer has committed distribution of child pornography in violation of 18 U.S.C. §2252A (a)(2).

**STATUTORY AUTHORITY**

6. This investigation concerns possible violations of 18 U.S.C. §2252A, relating to material involving the sexual exploitation of minors.

7. 18 U.S.C. § 2252A(a) prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, possessing, or accessing with intent to view any child pornography, as defined in 18 U.S.C. § 2256(8), when such child pornography was either mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer, or when such child pornography was produced using materials that had traveled in interstate or foreign commerce.

## DEFINITIONS

8. The following definitions apply to this Affidavit:

a. "Child Pornography," as used herein, includes the definition in 18 U.S.C. § 2256(8) (any visual depiction including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means of sexually explicit conduct, where (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), and also includes any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct. 18 U.S.C. §§ 2252 and 2256(2).

b. "Visual depiction" includes undeveloped film and videotape, data stored

on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format. 18 U.S.C. § 2256(5).

    c.    "Sexually explicit conduct" means actual or simulated (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person. 18 U.S.C. § 2256(2)(A).

    d.    "Minor" means any person under the age of 18 years. 18 U.S.C. § 2256(1).

    e.    "Computer," means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device. 18 U.S.C. § 1030(e)(1). The term computer includes desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

    f.    "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to,

keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

g. "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

h. "Computer related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

i. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

j. "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. Traditionally, IP addresses were either dynamic, meaning an Internet service provider (ISP) assigns a different unique number to a computer every time it

accesses the Internet, or static, meaning an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. Generally, the static IP addresses were assigned by those companies who offered "broadband" Internet service, such as through cable or digital subscriber line (DSL), whereas "dial-up" companies would assign their users dynamic addresses. Now, however, as a greater number of American Internet users choose broadband Internet service, many of these users are being assigned what may be colloquially referred to as a "sticky dynamic IP address" or a "sticky IP." A sticky IP is a dynamically assigned IP address that does not change often. The address leases are usually set to long periods and simply renewed upon expiration. The practical effect is that one may observe a user being assigned the same IP address for weeks or months and then assigned another IP address for a similar stretch of time.

    k.  The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, electronic or magnetic storage devices such as floppy diskettes, hard disks, compact discs (CDs), digital versatile disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

l.      The terms "jpeg," "jpg," "gif," "bmp," and "art" are examples of file extensions associated with graphic image files.

m.      The terms "mpeg," "mpg," "mov," "avi," "rm," and "wmv" are examples of file extensions associated with video files. To use these video files, one needs a personal computer with sufficient processor speed, internal memory, and hard disk space to handle and play typically large video files. One also needs a video file viewer or client software that plays video files. One can download shareware or commercial video players from numerous sites on the Internet.

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

9.      Computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. There were definable costs involved with the production of pornographic images. To distribute these on any scale required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts, mailings and telephone calls. Now, computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

10.     Child pornographers can now transfer photographs from a camera onto a computer readable format with a device known as a scanner. Also, with the advent of digital

cameras, images can be transferred directly onto a computer. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. With a computer and modem, electronic contact can be made to literally millions of computers around the world.

11.     The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The capacity of the electronic storage media (usually a type of hard drive) used in or with home computers has grown tremendously within the last several years. These drives can now store in a relatively small device thousands of images at very high resolution. Further, these drives can, at times, be removed and stored separately from the central processing unit.

12.     The Internet and World Wide Web afford collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

13.     Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered via the Internet such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides electronic mail (e-mail) services as well as electronic storage of computer files in a variety of formats. A user can set up an online storage account from any computer with access to the Internet. Thus, child pornography can be stored either on a user's computer or in a user's online account. However, even in cases where online storage is used, evidence of child pornography can be found on the user's computer in most cases.

14.     As is the case with most digital technology, communications by way of computer

can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.

## KIK MESSENGER

15. Kik Messenger ("Kik"), is a free instant messaging mobile app from the Canadian company Kik Interactive, available free of charge on iOS, Android, and Windows Phone operating systems. Kik uses cellular data or Wi-Fi to transmit and receive messages, photos, videos, sketches, mobile webpages, and other content after users register a username. Kik is primarily a social media mobile device application designed for mobile messaging and communication. To use this application, a user downloads the application via a service such as the Google Play Store, Apple iTunes, or another similar provider. It may also be downloaded to a tablet, laptop or desktop computer, as well.

16. Once the application is downloaded and installed, the user is prompted to create an account by providing a first name, a last name, an email address and a username. The first and last name are submitted by the user and are not verified by Kik, and may or may not be the user's real name. Kik attempts to verify the email address provided by the user by sending an email message containing a verification link. Kik allows new accounts to operate without verifying the account but Kik is able to identify which email addresses have been verified and

which have not. The user creates his/her own username which must be unique and therefore not already in use. The username will then be what other Kik users see when transmitting messages back and forth.

17. Once the user has created a Kik account, the user is able to locate other users via a search feature, and the two parties can then send messages, images, and videos between them. Users are also able to create chat groups of up to 50 people, to communicate in a group setting and exchange images and videos. These groups are administered by the creator who has the authority to ban and remove other users from the created group. Once the group is created, users have the option of sharing a link to the group with all of their contacts or any other user. These groups are frequently created with a "hashtag" that is easily identifiable or searchable by keyword.

18. Based on my training and experience, I understand that Kik is known for its features preserving users' anonymity, such as allowing users to register without providing a telephone number.

19. Based on my training and experience, I also I know that Kik users who are interested in trading child pornography try to monitor who is admitted into their groups by requiring either someone to vouch for you before being admitted or to require you to provide child pornography before being admitted to ensure you are not an undercover law enforcement officer. I also know that individuals in these chat groups are frequently banned or removed for their failure to post child pornography material within a specific period of time determined by the group administrator. The groups are also used as meeting grounds for users with common interests to acquaint themselves and then leave the group to communicate via direct one-to-one

messaging. Some Kik users also provide links or password access to larger quantities of child pornography that are stored in a cloud-based storage service.

## BACKGROUND OF INVESTIGATION

20.     On or about August 31, 2017, I received information from the Department of Homeland Security Investigations Cyber Crime Center (C3), Child Exploitation Investigations Unit (CEIU) indicating that Kik Interactive had provided information to law enforcement regarding child pornography uploaded from a user believed to be in the United States. I received disk containing images and reports related to the activity.

21.     Your affiant is aware that the Kik application logs user IP addresses which the company can use to determine access from a particular account as well as general location. Kik interactive also utilizes Microsoft's PhotoDNA cloud service to automatically detect, delete, and report the distribution of child exploitation images on its app. PhotoDNA operates by comparing images against an existing database of exploitative images.

## SILENTFRIEND

22.     According to information your affiant received, the user created an account with Kik Messenger with the user name "silentfriend." The user then used the Kik application to upload approximately four (4) images of child pornography using Kik for another Kik user to download to their computer or smart phone.

23.     More specifically, Kik Interactive provided information to law enforcement that the Kik account of "silentfriend" was opened and activated by a user who provided an email address of danielfleisch@gmail.com when they opened and activated the Kik account. Kik

Interactive also provided an IP address of 73.114.16.224 associated with the account of "silentfriend." A preservation request and subpoena was sent to Google for the subscriber information of the Gmail account, but the information has not been received.

24. A second IP address associated with the account of "silentfriend" was also provided to law enforcement by Kik Interactive. Your affiant made contact with a representative from Kik Interactive to verify which IP address had uploaded the child pornographic messages. Kik Interactive's representative responded that the IP address of 73.219.223.171 was responsible for the uploading of the images of child pornography and the uploads occurred on May 3, 2017 at 06:36:51, 06:37:04, 06:37:13 and 06:37:19 UTC.

25. Through the use of publically available search tools, your affiant learned that both of the IP addresses, 73.114.16.224 and 73.219.223.171, are controlled by ISP (Internet Service Provider) Comcast Cable Communications and are geolocated to Connecticut.

26. Your affiant also reviewed the four (4) images received from Kik Interactive via the Department of Homeland Security. Based on my review of the images, I believe the same prepubescent female is depicted in each image. The prepubescent female is naked (with the exception of a necktie and belly-chain) and posed in various ways, with her vagina and anus exposed and displayed in a sexually explicit manner as the focal point of three images and her vagina is displayed as the focal point of the fourth image. Based on my training and experience, your affiant estimates that the age of the female depicted in the images is between 8-10 years of age.

27. Your affiant understands that Title 18 United States Code 2256 defines child pornography as any visual depiction of sexually explicit conduct or sexually suggestive images

involving a minor (someone under 18 years of age). Visual depictions include photographs, videos, digital or computer generated images indistinguishable from an actual minor, and images created, adapted, or modified, but appear to depict an identifiable, actual minor. Undeveloped film, undeveloped videotape, and electronically stored data that can be converted into a visual image of child pornography.

28. On September 26, 2017 your affiant requested from Comcast Communications subscriber information for the account that utilized the IP address 73.219.223.171 on May 3, 2017 at the times 06:36:51, 06:37:04, 06:37:13 and 06:37:19 UTC. The response from Comcast Cable Communication identified the account using that IP at those times as account # 8773405030267834 which is subscribed to Linda Gauvin of 13 Arthur Court, North Branford, Connecticut, 06471. Comcast Communications further indicated that there are two email addresses associated with the account "tigerlillylg65@comcast.net" and "danielfleischauer@comcast.net."

29. Your affiant observed the similarity between the names contained in the Comcast email address danielfleischauer@comcast.net and the email address danielfleisch@gmail.com which was used when the "silentfriend" account was activated on Kik.

30. On September 27, 2017, a public records database available to law enforcement revealed records for Daniel Fleischauer, born in 1986, and indicated that he resided at the address of 13 Arthur Court, North Branford, Connecticut, 06471, and that the information was last confirmed on May 14, 2017 via sources which include Experian and Experian Gateway.

31. Connecticut Department of Motor Vehicles ("CT DMV") provided information indicating that two individuals, Linda Gauvin, born in 1949, and Daniel Fleischauer, born in

1986, were issued Connecticut driver's licenses with a listed address of 13 Arthur Court, North Branford, Connecticut, 06471. CT DMV also indicated that Fleischauer's license was suspended on June 10, 2016.

32. A property search from the North Branford Assessor's Office identified the homeowners of 13 Arthur Court in North Branford as Linda Gauvin and Shirley Mawney. Based on public records, your affiant believes that Ms. Mawney passed away on September 5, 2017 at the age of 93 and was the mother of Linda Gauvin.

33. North Branford Police Department Detective Sergeant Anderson also provided information to your affiant regarding the residence at 13 Arthur Court, North Branford, Connecticut. Detective Sergeant Anderson reported that he and other North Branford Officers had been to 13 Arthur Court in the late summer or early fall of 2017 for a welfare check in connection with an older woman who lived there. Detective Sergeant Anderson confirmed that during the welfare check he met and spoke with Daniel Fleischauer, born in 1986, who was residing at 13 Arthur Court, North Branford, Connecticut.

34. Detective Sergeant Anderson indicated that there is a main house and an in-law apartment connected by a breezeway and that Fleischauer resides the in-law-type apartment that is on the left as you look at the residence from the road. The main entrance to the in-law apartment is an interior door in the breezeway area. Detective Sergeant Anderson observed the interior of Fleischauer's apartment during the welfare check and recalled seeing a desk in his apartment with computer equipment and three computer monitors set up next to each other. He further reported his observation that Fleischauer was computer and tech savvy.

35. Based on your affiant's review of online records, your affiant believes that

Fleischauer has a registered Limited Liability Company in Connecticut known as Liquid Fire Technologies, with an address of 13 Arthur Court, North Branford, Connecticut

36. Results of a Google search performed by your affiant on September 27, 2017 indicate that Liquid Fire Technologies, with an address of 13 Arthur Court, North Branford, Connecticut, is a company involved in website design.

37. In addition, your affiant also learned from criminal records checks that Fleischauer was convicted in 2009 of Manslaughter 2nd degree (a felony), in violation of Connecticut General Statutes Section 53a-56b, and Operating Under the Influence, in violation of Connecticut General Statutes Section 14-227a, and was discharged from the CT Department of Corrections on October 19, 2012. In addition, records reflect that Fleischauer pleaded guilty to Violating a Protective Order on April 10, 2014 as a result of a domestic incident that occurred on October 19, 2013. In August, 2014, it appears that Fleischauer was also charged with Violation of Probation, in violation of Connecticut General Statutes Section 53a-32. Your affiant has also learned that Fleischauer is currently under the supervision of the Connecticut Department of Adult Probation until June 20, 2018.

38. A drive-by surveillance conducted on October 10, 2017, revealed that 13 Arthur Court, North Branford, Connecticut, is described here and in Attachment A as a red two-story cape-cod style house with white trim and shutters and a wooden ramp to a breezeway that connects the main house to an in-law apartment to the right of the main house and a door to the in-law apartment in the breezeway ("SUBJECT PREMISES").

39. On December 13, 2017, a search warrant was executed at the residence of Mr. Fleischauer, 13 Arthur Court, North Branford, Conencticut. Your affiant observed that Mr.

Fleischauer had a substantial quantity of computer equipment in his residence.

40. Mr. Fleischauer was interviewed by law enforcement and admitted that he sent and received child pornography online. He further admitted that he used Kik to upload child pornography.

41. He further admitted that he used the applications Kik as well as Cyphr to communicate with multiple girls whom he believed to be ages 12 and 13. He admitted sending videos of himself masturbating to the girls. He also admitted that the girls made sexually explicit videos at his request, including videos of themselves masturbating, and sent them to him.

42. He admitted that he has a sexual interest in minors. He also admitted that recently he has sought access to minors.

43. Based on the information above and my training and experience, I believe there is probable cause to believe that Daniel Fleischauer has distributed child pornography, in violation of 18 U.S.C. §2252A(a)(2).

44. In consideration of the foregoing, I respectfully request that this Court issue a criminal complaint of Daniel Fleischauer for distribution of child pornography in violation of 18 U.S.C. §2252A(a)(2) an warrant authorizing the arrest of Daniel Fleishcauer.

## REQUEST TO SEAL

45. Because this is an application that pertains to an ongoing criminal investigation, and because disclosure of the information contained herein as well as disclosure of the authorized charge and potentially endanger the agents who will seek to

execute the arrest warrant requested herein, I respectfully request that the complaint and arrest warrant and this affidavit be ordered sealed by the Court, until the arrest has been executed.

Respectfully submitted,

Amanda Devan
Task Force Officer
Homeland Security Investigations (HSI)

Subscribed and sworn to before me
on December 13, 2017:

/s/ Sarah A. L. Merriam, USMJ

HON. SARAH A.L.MERRIAM
UNITED STATES MAGISTRATE JUDGE