UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| vs. | : | CRIMINAL NO. 3:18CR293 (JCH) |
| DANIEL FLEISCHAUER | : | JULY 3, 2019 |

### <u>MEMORANDUM IN AID OF SENTENCING</u>

The Defendant, Daniel Fleischauer, respectfully submits this memorandum in aid of his sentencing scheduled for July 9, 2019, at 2:30 PM.  On November 15, 2018, Mr. Fleischauer appeared before this Honorable Court, waived indictment, pleaded guilty to count one of an Information, charging enticement of a minor, in violation of 18 U.S.C. § 2422(b).  In appearing before the Court, Mr. Fleischauer admitted his crime and accepted responsibility for his conduct. He writes:

> Honestly, my feelings about the arrest are mixed.  I am mostly remorseful for the pain I caused to the victims and their families.  I am also relieved that I was eventually arrested.  Regarding the crime, my crime, I feel disgusted, appalled, remorseful, repentant, repulsed.  It is no longer a part of who I am, yet will always be a part of what I have done.
>
> Daniel Fleischauer

He now comes before this Court chastened, and deeply remorseful for his misconduct and fully aware in the wrongfulness of his actions.  In advance of sentencing, he files this memorandum to urge the Court in the exercise of its duty to fashion a 10 year sentence, which is sufficient but not greater than necessary to serve the purposes of a sentence as set forth in 18 U.S.C. § 3553(a)(2). The sentence would include a substantial period of supervised release with continued intensive behavioral health treatment.

I.      **INTRODUCTION**

Statutorily, the Court must sentence Mr. Fleischauer to a mandatory minimum 10-year term of imprisonment.  The Presentence Report (PSR) and, the parties calculate the sentencing guidelines range at 210 to 262 months.  Though the Probation Office, at Par. 109, expressly suggests, "*The Court may wish to consider the need for incremental punishment when sentencing the defendant as he has only ever served just under three years of imprisonment*." (Emphasis added).

According to the attached forensic-psychiatric evaluation, "Mr. Fleischauer's offense conduct is a direct manifestation of his psychiatric pathology and severely disordered personality. The confluence of his depression, Borderline Personality disorder and Pedophilic Disorder, have caused him to develop the distorted cognitive processes which aggravate his current level of risk." Further, the evaluation offers, "With continuous, meaningful therapy specifically oriented to sexual behavior, Mr. Fleischauer's level of risk could be significantly mitigated."

Certainly, Mr. Fleischauer understands the seriousness of the offense.  As a recent Second Circuit case stated, cases involving child pornography are "different"; they "are associated with our most powerful taboos." *United States v. Brown*, 843 F.3d 74, 85 (2d Cir. 22016)(Sack, J., concurring).  Mr. Fleischauer acutely feels the gravity of the offense and the harm he caused.  In his letter to the Court, he writes how he thinks about his criminal conduct and he did to the minors, daily.  Moreover, his remorse is not abstract.  In his letter, Mr. Fleischauer grapples concretely with the trauma he caused and its potential aftereffects for the minors involved, including depression, difficulty forming relationships and trust issues.

Mr. Fleischauer's case is outside the heartland of enticement cases not only because of his powerful remorse, but also because of his commitment to treatment and change.  Dr. Bardey's evaluation of Mr. Fleischauer identified several contributing to this offense: depression, trauma,

alcohol abuse, and other contributing disorders. His long period of pre-trial and presentence detention was spent not only reckoning with the harm he caused but also planning for how to rehabilitate himself so that this conduct never occurs again. His plan includes supervision, meaningful treatment, and detailed release goals.

After *United States v. Booker*, 543 U.S. 220 (2005), this Court has discretion, having considered the advisory Guidelines, to impose a non-Guidelines sentence. This Court's "considerable discretion" includes the discretion to vary from the advisory Guidelines range based solely on policy disagreement with the Guidelines, particularly where, as here, the governing Guideline is based on policy considerations rather than the Sentencing Commission's traditional role of applying empirical expertise.

Here, the non-Guidelines sentencing factors in 18 U.S.C. § 3553(a) – all of which must be considered along with the Guidelines – weigh heavily in favor of a non-Guidelines sentence significantly below the advisory range proposed in the PSR or even as calculated by the parties. First and foremost, despite the unfortunate set of facts surrounding Daniel's 2009 2nd degree manslaughter conviction, his otherwise scant criminal history strongly supports a lenient sentence. Second, he is committed to changing his life, and has solid and attainable life goals. And, he will use his faith as a vehicle to getting there. Third, the goal of rehabilitation would not be served by a lengthy term of incarceration that would thwart Daniel from returning to be a productive member of society. Fourth, a lengthy prison sentence is not necessary as a deterrent to others, because the Defendant's conviction has already had a significant deterrent effect, as would even a ten-year sentence. Fifth, as Alexander Sasha Bardey, M.D. explains, based upon his exhaustive examinations, with continuous, meaningful therapy specifically oriented to sexual behavior, Daniel's level of risk could be significantly mitigated.

Further, Dr. Bardey explains if Daniel were to engage in *meaningful* treatment to directly address both his paraphilia and Borderline Personality Disorder, in addition to continuous monitoring of depressive symptoms and alcohol use, the risk to recidivate could be significantly reduced.  Daniel, moreover, is eager to receive psychotherapeutic support after he completes his term of imprisonment.

## II.     SENTENCING PRINCIPLES

Section 3553(a) of Title 18 requires a district court to consider seven enumerated factors in determining a sentence, and to begin its analysis by considering the fourth factor, the United States Sentencing Guidelines ("the Guidelines").[1]  *See United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005); *see also Gall v. United States*, 552 U.S. 38, 49-50 (2007) (stating that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. . . .  The Guidelines are not the only consideration, however. . . .  [T]he district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by the party").  Once the § 3553 factors have been considered, the Court must decide whether to:  (1) impose a sentence within the applicable Guidelines range or within permissible departure authority; or (2) to impose a non-Guidelines sentence, which is known as a "variance."  *See Crosby*, 397 F.3d at 113.  An overarching principle is that "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 131 S. Ct. 1229, 1233 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).

Not only does a sentencing court have "broad latitude to 'impose either a Guidelines sentence or a non-Guidelines sentence,'" *United States v. Rigas*, 583 F.3d 108, 114 (2d Cir. 2009),

---

[1] The seven factors are:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to accomplish the listed goals of sentencing; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established by the

the Supreme Court has made clear that a sentencing court may not apply any presumption of reasonableness to a Guidelines sentence. *See Nelson v. United States*, 555 U.S. 350 129 S. Ct. 890, 891-92 (2009) (per curiam); *Rita v. United States*, 551 U.S. 338, 351 (2007) ("the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply").

The Court must still begin its inquiry by determining and then considering imposition of a sentence within the applicable Guideline range. *See Kimbrough v. United States,* 552 U.S. 350 (2009), *United States v. Regalado*, 518 F.3d 143, 146 (2d Cir. 2008). However

> "[e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guideline sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the § 3553(a) sentencing factors. Under § 3553(a)'s "parsimony clause," it is the sentencing court's duty to "impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth" at 18 U.S.C. § 3553(a)(2)."

*United States v. Dorvee*, 616 F.3d 174, 182-3 (2d Cir. 2010)(internal citations omitted).

## III.      BACKGROUND

Daniel Fleischauer is a 32-year-old, white male born from the union of William and Kathrine Fleischauer in Guilford, CT.  Although raised by his parents, while living with three siblings, Daniel always felt isolated.  He was "very isolated" while growing up.  Daniel elaborated by explaining, he felt alone and rejected from his family and peers.  Daniel often kept to himself because he was scared of his older half-brothers, who physically assaulted him throughout his youth.  He described how his brothers tortuously sat on his head to the point where Daniel could not breathe, and felt as though he would "pass out."  Both of his older half-brothers shared the same father, who Daniel described as "unwelcoming."  Daniel's oldest brother, Mark, was "in and out" of his life.  Mark started abusing drugs and alcohol at a young age.

---

Guidelines; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities; and (7)

As a young child, Daniel recalls his discipline exacted with spanking, yelling and being put in the corner.  As he got older, Daniel's father beat him with a belt and grounded him for weeks at a time.  He does not recall his siblings being held to the same standards.  After the age of 12, Daniel recalls his father's alcoholism increasing along with the verbal abuses.  At 13-years-old, Daniel recalls a domestic dispute between his parents where Daniel felt compelled to call the police in an effort to protect his mother.  This hostile environment cultivated between his parents persisted until his mother filed for divorce.

For Daniel, the year he was 13, is associated with many challenging memories.  Both Daniel and his mother recall an upsetting fishing trip to Massachusetts between her son and his father. Ms. Fleischauer recalls that while fishing, his father got so intoxicated that strangers had to bring them both back to the motel. Ms. Fleischauer reported that this experience devastated her son.  Daniel recalls more details including going to a bar with his father after fishing, and meeting a couple at a bar.  Daniel remarked that all the adults became intoxicated, his father becoming severely intoxicated and how his father grew extremely agitated.  Daniel spent much of that evening trying to deescalate his father's agitated state, but remembers staying up all night hearing his father anger through yelling and knocking down things, while waiting for him to fall asleep.  Ms. Fleischauer reported that this experience "devastated" her son.

Today, Daniel struggles with memory gaps regarding parts of his childhood.  Oftentimes, this can be the brains response to early childhood traumas.  He describes a few instances where he was sexually assaulted as a young child.  At approximately 4 or 5 years old, Mr. Fleischauer recalls being with his maternal-grandfather and sister when he was molested by his grandfather. A year or two later, Mr. Fleischauer recalls an incident occurring at his uncle's apartments, but the memory remains "locked away."

---

the need to provide restitution to victims of the offense.  *See* 18 U.S.C. § 3553(a).

While Daniel was growing up, his mother worked 2-3 jobs at a time in a variety of corporate and medical offices. Due to her ex-husband being injured and collecting disability, Ms. Fleischauer was responsible for the family financially. Ms. Fleischauer explained Daniel spennt a lot of time with his father after and before school. Ms. Fleischauer reported that when she married her ex-husband, he was a recovering alcoholic. He maintained sobriety until Daniel was 6-years-old. When asked what Daniel's relationship was like with his father, she reported she did not really know because she was not home due to her "chaotic work schedule."

Around the start of the third grade, Daniel starting receiving special education services around the third grade for 'partial dyslexia.' He reported having problems with focus and distractions. While in school, he found himself "anxious and distracted thinking about what was going on in my life and at home." He often spent time in the resource room away from other children. At the age 8, doctors diagnosed Daniel with depression. Social workers evaluated him every three years from that point on. In 3rd and 4th grade, he started seeing school counselors, which increased as he entered middle school. Here, too, Daniel was frequently bullied by his peers. For example, he was pushed by other children, and made fun of for his last name. The bullying persisted throughout school until he started attending Cedarhurst School. He reports not having many friends in school because of the bullying and his lack of trusting others.

By middle school, Daniel reported having episodes of "shutting down." These episodes included Daniel stiffening his body in a rigid posture, often the fetal position, with a fixated eye-stair. Ms. Fleischauer described Daniel's emotional challenges during childhood as having anger issues and not being able to handle confrontation. She stated that "did not know how to stick up for himself." Finally when Daniel was 13 years old, Ms. Fleischauer called 9-1-1 due to her son's concerning behavior. This behavior included "shutting down," and barricading himself in his room.

Case 3:18-cr-00293-JCH   Document 61   Filed 07/03/19   Page 8 of 20
- 8 -

After the police arrived, Daniel threatened to harm himself.  He was taken to Yale Psychiatric Hospital for impatient treatment.  He was in impatient for one month, followed by outpatient services.

> …Mr. Fleischauer "barricaded" himself in his room and was taken to Yale Medical "to be evaluated" and subsequently hospitalized at Yale Psychiatric Hospital "for two to three months." A discharge summary from the Yale Psychiatric Institute dated November 12, 1999 stated that Mr. Fleischauer was admitted on October 12, 1999 after being *taken by ambulance to the Yale-New Haven Hospital Emergency Room for barricading himself in his room and making passive suicidal gestures...The patient reported experiencing abnormal visual perceptions during the weekend prior to admission (saw a friends face change before him, has intrusive thoughts of killing people when he looks at them...The patient was admitted and transferred to the Intensive Outpatient Program on 10/15/1999 once the patient's level of safety was determined...The patient has participated in individual, family and group therapy addressing family conflict with siblings and parents, addressing school problems of anger management, social withdrawal, and academic failing grades, and developing coping skills to handle intense feelings of anger and depression."*
>
> Forensic Psychiatric Evaluation, by Dr. Bardey

While hospitalized, Daniel recalls being part of a drug trial for Olanzapine, which he was removed from after gaining 60-80 pounds in one month.  Afterwards, he participated in an outpatient program for four months.  According to the Yale records, Daniel eventually transferred to IOP, where he received further psychiatric services.  Upon his discharge in November 1999, he was diagnosed with Major Depressive Disorder, Recurrent, Moderate, R/O Psychotic Disorder NOS; Obesity; allergic to penicillin; parental marital progress; academic problems; father recently moved out of the home; father diagnosed with terminal illness; family conflict, and conflict with siblings.  During his treatment, he disclosed past homicidal ideation including thoughts of killing people when looking at them, along with visual hallucinations.[2]  The report also stated that Mr. Fleischauer was parentified as a child, with unrealistic responsibilities for a 13-year-old child.  This report indicated that he was working 35 hours a week at Madison.  He was described as having poor

hygiene, wearing the same clothing multiple times in a row and inadequate bathing. During his treatment, there were similar catatonic-like experiences or "shutting down" expressed by Mr. Fleischauer similar to the state that initially brought him in to the ER.[3]

Between the ages of 21-22, Daniel was hospitalized again at Yale New Haven Hospital after the death of his brother, Mark Albo.  Mr. Albo died due to being in a drunk-driving accident of which Daniel was the driver.  According to a March 2010 New Haven Register article, Daniel drove drunk off Flying Point Road boat ramp into the Long Island Sound.  Daniel was able to evacuate the drowning vehicle but his brother Mark was not as fortunate.  He recalls being hospitalized for hyperthermia.  He pleaded guilty and the court sentenced him to prison for the DUI and second-degree manslaughter.

Also around the time he lost his brother, Daniel was forced to give up on his dream career.  At the time of the car Daniel was weeks away from graduating from an EMT training course.  His future was well on the way, as he was one of the top students in the training course.  Daniel served time and was released from prison.  He tried to refocus, but could not get past his longstanding behavioral issues.  In his letter he attempts to explain what led to his present circumstances.

> If I had to think about the reasons I did this I point to a number of them.  I had a failing relationship that went to loneliness to no relationship.  If you could call it a relationship, what I had with my fiancé was unhealthy. That led to depression.  I became a shut in/recluse.  I had few friends.  I was living in a false reality, and had strong feelings of worthlessness.  I know those are no excuse to hurt someone else.  They are no excuse to hurt a child.
>
> I could have deleted my chat programs before they consumed me.  I could have turned myself in, though I was fearful, because I knew committed unspeakable crimes.  I could have told someone and gotten help.  I should have sought counseling from a support group.  I did not make enough money to continue counseling, but that is not a good excuse as to why I did not get help.  I was afraid, disgusted, hopeless, and felt unworthy of help.
> Daniel Fleischauer

---

[2] Yale-New Haven Hospital, Birth and Psychiatric Records, dated 1986, 10/199-11/12/1999

When asked to describe Daniel's strengths, his "he is a nice person" who is "liked" by people who meet him.  She called him a "gentle giant.'  She reported he is helpful and will do anything for people with a smile.  She described Daniel as a "people pleaser," and stated he has always found pride in making others happy. She stated that while being investigated, she remembers police officers and other professionals stating how helpful he was in providing helpful information.  She reported that not many people know about Daniel's current situation, and thinks others would be shocked to find out about this latest charge.  Before incarceration, she reported that he would always help his elderly land-lady with whatever he could, which included outdoor maintenance and paying bills.  She reported Daniel being "very smart and electronically inclined." Ms. Fleischauer stated she was very proud of her son because after his last incarceration, he had maintained two jobs until his most recent incarceration.

Since his detention at Wyatt, Daniel has participated extensively over the last year and a half in various biblical study programs.  Ms. Fleischauer reported that Daniel enjoys talking about Faith and she listens.  When asked if Faith played a large role in Daniel's family home she stated that since she ended up divorcing and remarrying, she was excommunicated from the Catholic Church. In their home, spirituality played a larger role.  Daniel has received positive feedback from program participants who have read and reviewed his work.  As a result, he successfully completed each of the programs demonstrating his commitment and willingness to learn (*see attached exhibits*). Daniel has turned to religion as a means of bettering himself and taking the next steps towards rehabilitation.  He has even donated some of his religious materials to other inmates so that they can benefit in the same way he did (*see attached exhibits*).

In addition to his religious devotion, Daniel is committed to ongoing mental health treatment.   He completed six modules of Wyatt's Mental Health Group Program and five modules

---

[3] *Id.*

of Wyatt's Sex Offender Treatment Program (*see attached exhibits*).   Both programs have continued to encourage Daniel to reflect upon himself and his actions and to further the process of rehabilitation.

Thinking long term, Daniel has put significant thought into plans for the future. Upon being released, Daniel desires to live a self-sustaining lifestyle which includes being on a small farm where he can cultivate crops including produce, seeds, grains, etc. and raise livestock so that he can maintain a sustainable source of food.  Specifically, he hopes to raise bees on his farm so that he can harvest the beeswax to make things like candles and lip balm (*see attached exhibits*).  He expresses interest in finding new ways to be resourceful and recycling things like waste into fertilizer for his crops.

Daniel is also an avid writer.  He enjoys writing from both a creative perspective and as a means of communication with others.  Daniel describes himself as an introvert and believes that he struggles to adequately express himself.   Writing has provided him with an opportunity to effectively communicate with others and clearly express his feelings.  He has written extensively while incarcerated and hopes to continue writing when he is released and even see some of his pieces get published.

Above all, Daniel looks forward to continue practicing his religion, and receiving the mental health treatment – he knows he needs.  Upon reflection, Daniel feels that finding religion has brought about a viable change in himself.  His goal is to use meditation and prayer as a way to connect with himself and find peace.  He looks forward to getting back to regular hands-on activities like gardening and being resourceful.   Most importantly, he hopes to rebuild his relationships with family members and friends upon his release and attend counseling on a regular basis.

## IV.    NATURE AND CIRCUMSTANCES OF OFFENSE

As described in the PSR, and in the Stipulation of Offense Conduct attached to the parties' plea agreement, between approximately October 2012 and December 2017, Mr. Fleischauer used internet-based video chatting services to communicate and chat with individuals, including minors. During some of the communications with minor females, topics of a sexual nature were discussed. Also, Mr. Fleischauer and some of the minors traded sexually inappropriate images with each other. There was no evidence on his computer that he shared these videos with anyone else.  There is no evidence that Mr. Fleischauer ever had any physical contact with any of the minors involved in the video chats.

From the time of his arrst, Mr. Fleischauer immediately agreed to speak with investigators and consented to a search of his computer devices.  In fact, Mr. Fleischauer entered into a proffer agreement with the government, which involved at least three meetings where Mr. Fleischauer offered detailed information - helping to fill in the blanks.  For instance, in several meetings Mr. Fleischauer sought to assist agents in obtaining the identities of some of the minors.  Even after his last proffer session, the defense continued to work on its own by issuing subpoenas to several companies, including Walmart and Amway in an effort to determine contact information of the minors.

As detailed in the forensic evaluation provided to probation, Mr. Fleischauer struggled during the time period he committed the crimes with mental health and substance abuse disorders. He had PTSD, was depressed and drinking alcohol to help him fall asleep.  Dr. Bardey's evaluation found that Mr. Fleischauer's conduct was influence my multiple disorders.

Clearly, Mr. Fleischauer has much work to do, both to atone for his crime and to rehabilitate.  Moreover, Mr. Fleischauer has a detailed plan for rehabilitation.  He has already begun

treatment, and will continue to do so at the Bureau of Prisons.  For Mr. Fleischauer, treatment will last for years after his release, and equally so after supervision.

## V.   A BELOW-GUIDELINES SENTENCE OR VARIANCE IS APPROPRIATE IN THIS CASE

There are circumstances in this case that are "of a kind or to a degree not adequately taken into consideration by the Sentencing Commission."   18 U.S.C. § 3553; USSG § 5K2.0.   Mr. Fleischauer asks the Court to exercise its discretion under *Booker* and *Crosby* and impose a sentence consistent with the dictates of 18 U.S.C. § 3553 that is less than the sentence recommended by the advisory guidelines.  Below are the bases for this request.

### A.   Trauma, Mental Illness, and Addiction

Mr. Fleischauer has co-occurring mental health and substance abuse disorders that are present to an unusual degree and take his case beyond the heartland of Guidelines cases.  While a defendant's mental and emotional conditions are not "ordinarily relevant" to a Court's departure analysis, see U.S.S.G. § 5H1.3, "there are indeed certain situations where a person's mental and emotional conditions may be taken into account in granting a downward departure." *United States v. Brady*, 417 F.3d 326 (2d Cir. 2005).  Moreover, post-Booker, a district court is of course free to impose a variance on the basis of a defendant's mental and emotional conditions as well has his substance abuse disorders.   Here, Mr. Fleischauer's extensive history of family dysfunction underscores what we see today.

> Mr. Fleischauer was administered the ACE Questionnaire, a 10 question selfreport assessment utilized to measure the presence of family dysfunction, abuse, and exposure to violence. Mr. Fleischauer scored a seven out of ten.  He indicated the presence of abuse and dysfunction in seven of the categories in question. Specifically, Mr. Fleischauer indicated that he was fearful of a parent or an adult in the household physically hurting him, he was a child of divorce or separation and that he lived with someone who was mentally ill, someone who went to prison and

someone who abused alcohol and/or drugs.  Of note, he also disclosed that that there was an adult or individual at least five years older than he that attempted to have oral and anal sex with him and who had touched or fondled him as well as made him touch their body in a sexual way.

Forensic Evaluation, by Dr. Bardey

Dr. Bardey emphasized that Mr. Fleischauer's psychiatric pathology, and severely disordered personality, and alcohol abuse influenced his conduct. As Dr. Bardey's reports notes, "However, his interest in and motivation for treatment is substantial and he appears to want to make changes in his life and has a positive attitude toward his responsibility for pursuing treatment.  Dr. Bardey also offered specific treatment modalities to alleviate any risk of reoffending.  Specifically, he explained, "Treatment in the form of sex offender specific therapy, in addition to intensive Dialectical Behavior Therapy (DBT), is clinically indicated at this time and would, if implemented, serve to specifically address his psychiatric symptoms, the distorted cognitive processes related to his sexual behavior, as well as his characterological deficits."

Likewise, the PSR notes, "Mr. Fleischauer may benefit from participating in the Sex Offender Treatment Program – Residential.  This program is a high intensity program designed for high risk sexual offenders.  The program consists of cognitive-behaviorally based psychotherapy groups, totaling 10 to 12 hours per week.  This program is offered at FMC Devens and USP Marion."  (PSR, ¶ 112).

**B.**      **Departure or Variance is Warranted because of Mr. Fleischauer Minimal Criminal History and his Expected Future Success.**

As indicated above, Mr. Fleischauer, at age 23, was convicted for manslaughter.  He is forthcoming about what lead to that criminal act as well as this one.  He struggles with his involvement with the death of his brother – to this day.  He is in criminal history category III, with 3 criminal history points.  With ongoing treatment and court supervision, Mr. Fleischauer will

flourish in the community.

Notably, as the PSR suggests, The Court may wish to consider the need for incremental punishment when sentencing the defendant as he has only ever served just under three years of imprisonment.  (PSR, ¶ 109).  We agree.

A sentence of imprisonment within the Guidelines range of 210 to 262 months would be unnecessarily excessive in the context of this specific case.  In *United States v. Mishoe*, the Second Circuit stated:

> Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences . . . for the prior offenses.

3d 214, 220 (2d Cir. 2001).  While the *Mishoe* decision principally addressed the Career Offender Guidelines, the teaching of that decision applies here.  Specifically, the concept of incremental punishment is relevant to the sentencing goal of deterrence.  Where an individual has a minimal incarcerative 3 year history, a Guidelines range recommending effectively up to a 21-year sentence is excessively severe.  There is no reason to believe in such an instance that a sentence that severe would be more effective than a lesser sentence, because there is no point of comparison or historical example to disprove the efficacy of a lower sentence.

C.    **Sentencing Guidelines**

The Guideline for 18 U.S.C. § 2422 is U.S.S.G. § 2G1.3, which cross-references U.S.S.G. § 2G2.1.  Under that Guideline the base offense level of 32.  A four level increase is added as the offense involved a minor who had not attained the age of twelve but not yet attained the age of sixteen pursuant to U.S.S.G. §2G2.1(b)(1)(A).  Two additional levels are added pursuant to

U.S.S.G. §2G2.1(b)(6)(B)(i) as the offense the offense involved the use of a computer or interactive computer service to persuade, induce, entice, or coerce a minor to engage in sexually explicit conduct, or otherwise solicit participation by a minor in such conduct.  The parties agree that the application results in an offense level of 38.   Three levels are subtracted for acceptance of responsibility, resulting in a total offense level of 35. Based on a Criminal History Category III, and a total offense level 35, the advisory Guidelines imprisonment range is 210 to 262 months.

### 1. Lack of Empirical Basis

Where a particular Guideline "do[es] not exemplify the [Sentencing] Commission's exercise of its characteristic institutional role," a Court is free to disagree with that Guideline.  *Kimbrough v. United States*, 552 U.S. 85, 89 (2007).  Not only are courts free to disagree with the Guideline, application of such a Guideline may itself constitute error when the application is inconsistent with the § 3553(a) factors.  *See generally United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010).

A properly promulgated Guideline requires the Sentencing Commission to consider empirical data and national experience. As the Supreme Court has explained:

> Congress established the Commission to formulate and constantly refine national sentencing standards.  Carrying out its charge, the Commission fills an important institutional role:  It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise. *Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007).

It is because of this process that the Guidelines are ordinarily deserving of some deference.

That institutional process was completely sidestepped in the case of the child pornography Guidelines.  As the Second Circuit has previously held, "the Commission did not use [an] empirical approach [based on data about past sentencing practices] in formulating the Guidelines for child pornography." *Dorvee*, 616 F.3d at 184.  Instead, Congressional directives have increased the penalties "despite evidence and recommendations by the [Sentencing] Commission to the contrary."

*United States v. Hanson*, 561 F. Supp. 2d 1004, 1009 (E.D. Wisc. 2008). The Court in *Dorvee* went on to note that these Congressional directives represent "a 'blatant' disregard for the Commission and are 'the most significant effort to marginalize the role of the Sentencing Commission in the federal sentencing process since the Commission was created by Congress." *Dorvee*, 616 F.3d at 184 (quoting Alan Vinegrad, The New Federal Sentencing Law, 15 Fed. Sent. R. 310, 315 (June 2003)).

The abdication of the Commission's institutional role is made plain by a review of the history of the child pornography Guidelines. The Second Circuit reviewed that history in *United States v. Dorvee* with a specific focus on U.S.S.G. § 2G2.2, the Guideline covering possession of child pornography, but the same legislative process affected the Guideline at issue here, U.S.S.G. § 2G2.1. *United States v. Brown*, 843 F.3d 74, 89 (2d Cir. 2016) (Pooler, J., dissenting). As a result, the *Dorvee* Court's analysis applies with equal force.

As the *Dorvee* court explained: "[A]t the direction of Congress, the Sentencing Commission has amended the Guidelines under § 2G2.2 several times since their introduction in 1987, each time recommending harsher penalties." *Dorvee*, 616 F.3d at 184. The 2003 and 2004 amendments increased the offense levels under U.S.S.G. § 2G2.1 as well. *See* U.S.S.G. Appendix C, Amendments 661 and 664. As a result, *Dorvee*'s analysis, which focused on U.S.S.G. § 2G2.2, applies with equal force to the Guideline at issue here § 2G2.1. *See United States v. Huffstatler*, 571 F.3d 620, 623 (7th Cir. 2009) (observing that challenges to validity and fairness of child pornography guidelines apply to production cases, and, in that case, that the government had conceded as much); *cf. Spears v. United States*, 555 U.S. 261, 266 (2009) (confirming that sentencing courts may vary from Guidelines on policy grounds).

The Third Circuit has summarized the history of § 2G2.2, and concluded:

> As described in the Commission's 2009 Report, and as discussed by the Second Circuit in *Dorvee*, and, by now, numerous district courts, § 2G2.2 was not developed pursuant to the Commission's institutional role and based on empirical data and national experience, but instead was developed largely pursuant to congressional directives. As one district court put it, "the Commission probably did the best it could under difficult circumstances, but to say that the final product is the result of Commission data, study, and expertise simply ignores the facts." *Diaz*, 720 F. Supp. 2d 1039, 1045 (E.D. Wis. 2010).

*United States v. Grober*, 624 F.3d 592, 608 (3d Cir. 2010) (internal citations and footnote omitted). The most recent significant changes to both § 2G2.1 and § 2G2.2 were dictated by Congress in the PROTECT Act of 2003. "Notably, the Sentencing Commission was neither informed nor consulted on the passage of these changes, and the legislative history surrounding them offered no study or empirical justification for them." *Dorvee*, 616 F.3d at 185, n.7.

In this case, the base offense level under § 2G2.1 is dramatically affected by the 2003 and 2004 Guidelines amendments. Under the 2002 Guidelines manual, the base offense level for this offense would have been 27. *See* U.S.S.G. § 2G2.1(a) (Nov. 2002). Now it is five levels higher at 32.

Because Guideline U.S.S.G. § 2G2.1 itself is skewed, application of the Guideline can result in an unreasonable sentence inconsistent with what § 3553 requires. *See Dorvee*, 616 F.3d at 184. Other courts have reached a similar conclusion. *See, e.g., United States v. Riley*, 655 F. Supp. 2d 1298 (S.D. Fla. 2009); *United States v. Grober*, 595 F. Supp. 2d 382 (D.N.J. 2008); *United States v. Stern*, 590 F. Supp. 2d 945 (N.D. Ohio 2008); *United States v. Doktor*, 2008 WL 5334121 (M.D. Fla. Dec. 19, 2008); *United States v. Johnson*, 588 F. Supp. 2d 997 (S.D. Iowa 2008); *United States v. Noxon*, 2008 WL 4758583 (D. Kan. Oct. 28, 2008); *United States v. Shipley*, 560 F. Supp. 2d 739 (S.D. Iowa 2008); *United States v. Baird*, 580 F. Supp. 2d 889 (D. Neb. 2008); *United States v. Hanson*, 561 F. Supp. 2d 1004 (E.D. Wis. 2008).

2. **Comparison With State Penalties**

The investigation of Daniel Fleishauer took several months, before he pleaded guilty in federal court.  He agreed to several continuances, and assisted in his federal prosecution by not asserting his trial rights.  Had he been charged in state court might have faced one count of illegal possession of child pornography in the first degree, Conn. Gen. Stat. 53a-196d, which is a B felony.  The maximum penalty for a B felony is 20 years in prison and a $15,000 fine.   The mandatory minimum is 5 years in prison.  By contrast, in federal court, Mr. Fleishauer faces a mandatory minimum of 10 years and a maximum of life in prison.   Thus, by having his case charged federally, the mandatory minimum applicable to Mr. Fleishauer immediately *doubled*.

Furthermore, Connecticut, unlike the federal system, allows for early release through parole.  A person convicted of the statute with which Mr. Fleishauer is charged would be eligible for parole after serving 50% of his sentence.  *See* List of 85% and Parole Ineligible Offenses, http://www.ct.gov/bopp/cwp/view.asp?a=4330&q=510680.

A review of the applicable statutes in other states also shows significantly lower penalties.  New York punishes the crime of promoting an obscene sexual performance with a child with up to 7 years' imprisonment.  2012 Commission Report at App'x F-15. *See also* N.Y. Penal Law §§ 263.10, 70(2)(d).  According to the Sentencing Commission, the range in New Jersey is 5-10 years; in California, 3-8; in Rhode Island, 0-15 years.  *See id.* at F-2, F-14, F-18.

D. **A Departure or Variance is Warranted to Accurately Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.**

Daniel is at the mercy of the sentencing guidelines that an independent Congressional report has criticized for being unjust.

A departure or variance will provide more than enough punishment for Daniel and will

promote respect for the law.  As to specific deterrence, this Court has Daniel's assurance that he will never face a sentencing court again.

## CONCLUSION

For the reasons discussed in this memorandum, in addition to any other deemed appropriate by the Court, Daniel Fleischauer respectfully requests that the Court impose a 120 month sentence followed by a period of supervised release.

THE DEFENDANT,
Daniel Fleischauer

Dated: July 3, 2019

/s/   Tracy Hayes
Tracy Hayes
Assistant Federal Defender
265 Church Street, Suite 702
New Haven, CT. 06510
Bar No. phv06527
(203) 498-4200
Email: tracy_hayes@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 3, 2019, a copy of the foregoing Memorandum in Aid of Sentencing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Tracy Hayes
Tracy Hayes